```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )         4:05CR3045
     v.                        )
                               )
OMAR R. DE LAO OLIVEROS,       )      REPORT, RECOMMENDATION
                               )           AND ORDER
           Defendant.          )
                               )
```

An evidentiary hearing was held before me on June 8, 2005 on the defendant's motion to suppress evidence. After the hearing the defendant requested and I granted leave to submit additional photographic evidence. Having now considered all of the evidence, I shall recommend that the motion be denied in all respects.

## FACTS

Defendant was stopped for speeding on Interstate 80 outside of Lincoln, Nebraska on March 28, 2005. He was issued a warning citation by Nebraska State Patrol Trooper Chris Bigsby for driving 70 mph in a 65 mph zone. In the course of checking the defendant's driver's license, vehicle registration, and checks on whether the defendant or the vehicle were wanted in relation to any criminal activity, Bigsby asked defendant a number of questions concerning his trip, its origin and purpose, and his destination.

Defendant told Bigsby that he had driven from Utah, leaving two days before, and was en route to Chicago for the purpose of giving a friend some money. Defendant named the friend, Richard

Martinez, and indicated Martinez was leaving from Chicago the next day to return to Mexico and had agreed to take the money to defendant's mother in Mexico.  Defendant was courteous and cooperative throughout the conversation.  His driver's license was valid.  He had no criminal history.  There was no report that the vehicle was stolen; and unlike many vehicles later found to be carrying drugs, this vehicle was not rented nor recently purchased; defendant had bought it approximately six months earlier.

   During the citation procedures, however, Bigsby became suspicious that the defendant may be carrying drugs.  He testified that his suspicion was aroused by several observations.  The vehicle had a "lived in" look, that is, it had fast food wrappers, a water bottle, and clothes hanging in a "cleaners bag" in the back seat.  Bigsby noticed an overwhelming odor of air fresheners emanating from the vehicle, and also saw air fresheners fastened to the front of the air/air conditioning vents as well as an open can of air freshener on the console between the front seats.  The defendant's hands shook (never both at the same time, however), which Bigsby attributed to nervousness.  The defendant was traveling from Utah, a "drug source state," to Chicago, a "drug destination" city.  Although defendant had a name of the friend in Chicago to whom he was to deliver the money, he had no address, but rather, only a telephone number.  In response to Bigsby's questioning of how long he had been on the road, defendant said two days, and then changed his answer to one day.  Defendant also told Bigsby that it was costing him $600.00 to make the trip, a sum which appeared out of proportion to the purpose of the trip, sending money to defendant's mother, when it is possible to wire money to Mexico for much less than $600.00.  Finally, Bigsby noticed what he

considered to be an "Armor All" look about the dashboard area of the passenger compartment; he testified that the area was shiny and clean as if it had recently been tampered with and reassembled.

After completing the citation and handing the defendant back his license and registration documents along with the citation, Bigsby asked defendant if he could ask him a few more questions. Defendant willingly stayed in the trooper's cruiser for the additional questions.  In response to such questioning, defendant stated that he did not have any drugs, guns or money in the car.

Bigsby then asked defendant if he, Bigsby, could search the car.  Defendant said, "Yeah.  Go ahead."  At that point Bigsby retrieved a written consent-to-search form and placed it in front of the defendant.  It was in both English and Spanish, and Bigsby used the Spanish version.  He asked the defendant to read it aloud to show that he understood.  Although defendant did not at first comprehend the trooper's instructions, after a minute or two he did read the form aloud in Spanish.  Bigsby then asked defendant if he understood that the form was giving Bigsby permission to search the car.  Defendant agreed, and signed the form.  Bigsby then asked him verbally once again if he could search the car, and defendant again gave permission.

Bigsby started his search in the passenger compartment and found a "metal box," that had been placed up behind the dash area of the car with "after market" welding.  He said it also showed some "grind marks" on the metal.

At this time another trooper arrived with a drug detection dog.  The dog was taken around the vehicle twice, but it did not

3

alert or indicate the presence of drugs at any area of the car. Bigsby then had a third trooper (Trooper Dostal), who had also arrived to assist, look at the area of the metal box.  Dostal then asked the defendant if he'd had some recent work done on his car.  The defendant answered, "I don't know 'cause..." but his voice "trailed off" and he didn't finish his answer.

At no time did the defendant withdraw or limit the scope of his consent.  The troopers eventually found red cellophane packages of methamphetamine and cocaine behind the vehicle's radio.

DISCUSSION

Defendant argues that his rights under the Fourth Amendment were violated in three respects:  First, that after the drug detection dog was deployed and failed to indicate the presence of drugs, defendant was entitled under the Fourth Amendment to be asked once again if he still consented to the search of the vehicle; Second, that the scope of a vehicle consent search is limited by reasonableness, and using power tools to disassemble the car was not within normal meaning of "reasonable"; Third, that at the time Trooper Bigsby made his decision to search the car, he did not have sufficient information to create probable cause to believe that defendant was engaged in criminal activity.

The law is well established that when a driver has committed a traffic infraction, "however minor," probable cause has been established to stop the vehicle.  <u>United States v. Foley</u>, 206 F.3d 802, 805 (8th Cir. 2000); <u>United States v. Cummins</u>, 920 F.2d 498, 500 (8th Cir.1990) (traffic violations--however minor-- constitute sufficient probable cause to stop a vehicle).  The

4

initial stop of the vehicle was justified as speeding is obviously a traffic infraction. I proceed to the defendant's arguments set out above.

There is no doubt that the defendant consented to the search of the automobile, and that the defendant never limited the scope of his consent or withdrew his consent. Defendant argues, however, that after the drug dog was taken around his vehicle and did not alert or indicate the presence of drugs, the Fourth Amendment required that defendant be asked again, for the fourth time in this case, to reconfirm that he was, indeed, consenting to the search of the vehicle. Defendant has cited no authority for this proposition, and I have found none. In U.S. v. Escobar, 389 F.3d 781 (8th Cir. 2004) the court of appeals found a bus passenger's consent to search her luggage after she had been inaccurately advised that the drug dog had alerted to her luggage, was not a voluntary consent. Id. at 786. Cf. U.S. v. Flowal, 234 F.3d 932 (6th Cir. 2000), overruled on other grounds, U.S. v. Leachman, 309 F.3d 377 (6th Cir. 2002) (Consent search of air passenger's luggage which followed a drug dog's failure to alert to the bag did not violate Fourth Amendment when defendant's consent to search was sought because defendant matched "drug courier profile" and bags appeared suspicious; defendant's consent was independent act of free will, even though drug dog had failed to alert). Having found no case establishing a requirement to reconfirm a suspect's consent to search after a drug dog fails to alert to the presence of contraband, I employ the "totality of the circumstances" measure in reviewing these events.

In this case before the drug dog was deployed, Trooper Bigsby had already seen during the consent preliminary search

5

signs that the vehicle had been altered in the dash area of the passenger compartment, that is, the metal box, the "after market" welding, and the grind mark.  Later, after the drug dog failed to alert, Trooper Bigsby asked Trooper Dugger to look at those items.  Trooper Dostal also looked at the area.  One of the troopers asked defendant what the white box above the radio was, but no answer was provided.  In response to the question whether defendant had had any work done recently on the vehicle, defendant did not give a direct answer, and didn't complete the answer he started.  On closer examination, Bigsby saw what appeared to him to be black or red cellophane wrapping paper in the area which led to the discovery of the drugs.

Trooper Bigsby's sighting of the alterations to the radio compartment of the dash area, when coupled with his previous observations, provided probable cause to continue the search, even if defendant had tried to withdraw or limit his consent.  These observations were made before the dog was deployed.  Although the dog's failure to alert did not cement probable cause, it did not destroy it, either.  From the totality of the circumstances, there was a "fair probability" that contraband of some sort was being transported in that vehicle.  Illinois v. Gates, 462 U.S. 213 (1983).

Alternatively, even if the information Bigsby possessed did not at that time establish a "fair probability" of criminal activity, the defendant's consent continued, despite his knowledge of the happenings around him.  The drug dog's being "run around" the vehicle did not cause the defendant's three earlier consents to evaporate into thin air.  To the contrary, the drug dog's presence and deployment were simply continuing actions occasioned by the defendant's consents; they were not of

6

such a surprising nature, nor of such startling impact as to be beyond the contemplation or expectations of a reasonable motorist who has consented to the search of his vehicle.  Because he was near enough to the officers to converse with them, I infer that defendant was near enough that he could also either see or surmise what they were doing when they were looking in and around the radio compartment of his car.  He had to have been aware of it when they asked about recent work being done on that area.  Despite that knowledge, however, he did not withdraw his consent or instruct the officers to be careful not to break anything or otherwise limit his consent.  I conclude that the dog's deployment did not "attenuate" the defendant's earlier consents, and defendant's voluntary consents to the search of the vehicle continued without interruption.

   Defendant's argument that the officers exceeded the bounds of his consent, however, stands on firmer ground.  A search resulting from an individual's general statement of consent is limited by boundaries of reasonableness.  <u>United States v. Martel-Martines</u>, 988 F.2d 855, 858 (8th Cir.1993).

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" <u>Florida v. Jimeno</u>, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).  "Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents." <u>United States v. Strickland</u>, 902 F.2d 937, 942 (11th Cir.1990); <u>see</u> also <u>Arizona v. Hicks</u>, 480 U.S. 321, 324, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (seizure of property occurs when governmental intrusion "meaningfully interferes" with individual's possessory interest).  Accordingly, the cutting of the spare tire

7

> likely exceeded the scope of the consensual search and
> may well have required suppression of the evidence had
> the officers not had probable cause to expand the
> search. We need not speculate on what the outcome
> would have been had the troopers relied solely upon the
> consent given by Alverez, however, because observations
> made during the consensual search gave the officers
> probable cause to believe that there was contraband in
> the vehicle, thus lawfully expanding the scope of
> search under the automobile exception to the warrant
> requirement. United States v. Ross, 456 U.S. 798, 823,
> 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The
> "warrantless search of an automobile, predicated on
> consent, may be expanded beyond the scope of the
> consent when it yields a basis for a reasonable
> articulable suspicion that additional contraband may be
> found in parts of the car not included in the consent."
> U.S. v. Casares-Cardenas, et al., 14 F.3d 1283, 1286
> (8th Cir.1994).

U.S. v. Alverez, 235 F.3d 1086, 1088-1089 (8th Cir. 2000) (Emphasis added). Here, had Trooper Bigsby not discovered the "after market" alterations in the vehicle prior to embarking on a "search and destroy mission," I seriously doubt that such destruction could be said to be within the expectations of a "typical, reasonable person" driving across the country who consents to a search of his/her car. As in Alverez, however, the trooper did discover the alterations without any destruction at all. That discovery established probable cause to search all areas in the vehicle in which might be secreted illegal drugs. At that point the fact that such a search required power tools and some dismantling of the dash became immaterial.

Finally, even if my *post hoc* conclusions had differed from Trooper Bigsby's conclusions, he was objectively reasonable in concluding probable cause existed to believe that evidence of criminal activity would be found in the area searched. Though that standard does not widen the bounds of discretion a great amount, it does cover Bigsby's actions in this case.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, that the motion to suppress, filing 13, be denied in all respects.

FURTHER, IT HEREBY IS ORDERED, Trial of this matter is set to commence at 9:00 a.m., July 25, 2005, for a duration of two days before the Honorable Richard G. Kopf in Courtroom 1, United States Courthouse and Federal Building, 100 Centennial Mall North, Lincoln, Nebraska.  Jury selection will be held at commencement of trial.

DATED this 22nd day of June, 2005.

BY THE COURT:

s/ *David L. Piester*
David L. Piester
United States Magistrate Judge